**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**NANCY KILKENNY,**

                                        **Plaintiff,**

            *- against -*

**MICHAEL J. ASTRUE, COMMISSIONER of the**
**SOCIAL SECURITY ADMINISTRATION,**[1]

                            **Defendant.**

**05 Civ. 6507 (KMK) (LMS)**

**REPORT AND**
**RECOMMENDATION**

**TO:   THE HONORABLE KENNETH M. KARAS,**
         **UNITED STATES DISTRICT JUDGE**

Plaintiff Nancy Kilkenny (herein, "Plaintiff" or "Claimant") and Defendant Michael J.

Astrue, Commissioner of the Social Security Administration (herein, "Defendant" or

"Commissioner") cross move for judgment on the pleadings in the above-captioned action

seeking judicial review of the Commissioner's final decision denying the Plaintiff's application

for Social Security Disability Benefits.  See Docket #5, Plaintiff's Notice of Motion; Docket #8,

Commissioner's Notice of Motion.  Plaintiff commenced the instant action pursuant to 42 U.S.C.

§405(g) following Administrative Law Judge James Reap's (herein, "ALJ") decision finding her

not disabled under 42 U.S.C. §423(d) and the accompanying regulations for the period of time

between March 21, 2002, and December 21, 2004.  See Docket #1, Complaint; see also Docket

#4, Answer and Administrative Record (herein, "R.") at 13-20.  Plaintiff appealed the ALJ's

finding to the Social Security Appeals Council, which denied Plaintiff's request for review, see

---

[1]  Pursuant to FED. R. CIV. P. 25(d)(1), the name of the new Commissioner of Social
Security has been substituted for Jo Anne Barnhart who was the Commissioner of Social
Security at the time this action was filed.

1

R. at 3, and thereafter commenced the instant action challenging the Commissioner's final decision that she was not disabled during the specific time period in question.[2]

For the following reasons I conclude and respectfully recommend that Your Honor should conclude that the Plaintiff's motion for judgment on the pleadings should be granted on the limited basis that the ALJ committed legal error by failing to obtain all of the information pertinent to the Plaintiff's psychiatric impairments and that the Commissioner's motion for judgment on the pleadings should be denied.  I respectfully recommend that the case should be remanded to the Commissioner for further development of the administrative record concerning Plaintiff's psychiatric impairments for the time between March 21, 2002, and December 21, 2004, the date of the ALJ's decision.  Because the administrative record appears incomplete on this issue, the undersigned has limited the analysis offered herein to this discrete issue and offers no opinion as to whether the Commissioner's decision to deny the Plaintiff disability benefits is otherwise supported by substantial evidence.

## **BACKGROUND**

A.      Administrative Record

The following facts are drawn from the administrative record developed by the ALJ.

1.      Plaintiff's Application for Disability Benefits and Biographical Information

Plaintiff filed a claim for Social Security disability benefits on March 22, 2002.  R. at 60-73.  Plaintiff had worked as a dental assistant from 1987 until March 21, 2002, when Plaintiff

---

[2]  Plaintiff's counsel notes that the Plaintiff has since been found disabled as of December 22, 2004, by the Commissioner "based upon a re-application made March 8, 2005".  See Docket #6, Plaintiff's Memorandum of Law in Support of Judgment on the Pleadings (herein, "Pl's Mem.") at p. 11.

stopped working because of vision problems.  R. at 74; see also R. at 65.  Plaintiff was diagnosed with optic neuritis and as likely suffering from multiple sclerosis on June 25, 2001.  R. at 124-26.[3]  Plaintiff sustained blurred vision and then a total loss of vision in her right eye in May, 2001.  R. at 65; R. at 324-325.  Plaintiff subsequently regained vision in her right eye, but continued to suffer from double vision, which is referred to as diplopia, and needed corrective prism glasses to help her see clearly.  R. at 35; R. at 312-313.  Plaintiff filed her application for disability benefits noting that she suffered from a "loss of normal vision in [the] right eye - double vision," and "muscle spasms in [her] back [and] legs" on March 22, 2002.  R. at 65, 73.  Although Plaintiff complained of vision loss in May, 2001, she remained working until March, 2002, when she claimed she could no longer perform her job as a dental assistant due to her limited ability to see and handle small dental instruments.  R. at 325.

Plaintiff identified the following doctors as her treating physicians, noting that she had seen each of them for "injuries or conditions that limit[ed] [her] ability to work," but not for "emotional or mental problems that limit[ed] [her] ability to work[:]" Doctor Ute Traugott, Doctor Mark Kupersmith, and Doctor Christina Frantzeskos.  R. at 67-68.  Plaintiff explained that she saw each of these doctors because of pain she experienced in her head, numbness, vision loss, and ultimately for treatment for symptoms related to multiple sclerosis.  R. at 68.  Plaintiff also identified the medications she was prescribed and the side effects of those medications, including soreness at the site of her injections and tiredness.  R. at 70.  Plaintiff listed the medications she was taking for her multiple sclerosis as of March, 2002, as including Betaseron,

---

[3]  Optic neuritis is the inflamation of the optic nerve, a condition commonly associated with multiple sclerosis, impairing an individual's vision.  R. at 125.

3

Zanaflex, and Parmalor.  R. at 70.

"Plaintiff was born on December 5, 1957, and graduated from high school in 1976."  See Docket #9, Commissioner's Memorandum of Law in Opposition to Plaintiff's Motion and in Support of Commissioner's Motion (herein, "Comm. Mem.") at p. 2; see also R. at 47, 71.  As noted, Plaintiff worked as a dental assistant for fifteen years, ending in March, 2002, due to Plaintiff's limited vision.  R. at 65, 74.  Plaintiff noted that she has the primary responsibility for taking care of her son who suffers from a seizure disorder.  R. at 84.  Plaintiff explained she has to monitor her son's medication and to ready him for school, which usually consists of dressing him, making him breakfast, and driving him to school if "he is not doing well."  Id.  Plaintiff is responsible for monitoring her son's medication regimen, id., and must "always keep [an] ear out for" him as "he cannot be left alone," id.  Plaintiff testified at the administrative hearing before the ALJ that she is her son's "sole caregiver" and that she ensures that he attends his medical appointments either by making arrangements with friends to get him to his appointments or by driving him to the appointments herself.  R. at 320.  At the time of her administrative hearing, Plaintiff noted that her son was no longer taking the bus "because it was not safe," R. at 321, and that she had assumed the responsibility of getting him to school each day by driving him, id.

      2.      Plaintiff's Treating Physicians

            a.      Dr. Mark Kupersmith

Plaintiff admitted herself to Phelps Memorial Hospital on May 31, 2001, complaining of a loss of vision in her right eye, blurriness, an inability to see color, and numbness in her face.  See Pl's Mem. at p. 2; see also R. at 133-138.  Plaintiff was prescribed intravenous steroids at the hospital over the course of several days, R. at 124, 130-138, and was examined by Dr.

4

Kupersmith of Beth Israel Medical Center in June, 2001, R. at 124-126.  Dr. Kupersmith

confirmed the diagnosis offered by the hospital that Plaintiff suffered from an optic neuritis and

raised the possibility that Plaintiff was exhibiting the early signs of multiple sclerosis.  Id.  Dr.

Kupersmith observed that Plaintiff's vision in her right eye was 20/80, an improvement over the

20/100 visual acuity she had in the hospital in May, 2001, and that her vision in her left eye was

20/20.  R. at 124.  Dr. Kupersmith recounted that "[he] explained to [the Claimant] that most

patient's [sic] . . . make major improvement in their vision with optic neuritis with or without

treatment.  However, there is a small percentage of patients [who] don't improve.  The fact that

she is only 20/80 minus is a good sign."  R. at 125.  Dr. Kupersmith recommended a course of

prescription drug treatment in the event that Plaintiff's vision did not improve.  Id.  As noted by

the Commissioner, Plaintiff's vision was 20/20 in her left eye and 20/30 in her right eye in

August, 2001, and 20/20+2 in her left eye and 20/25+1 in her right eye in January, 2002.  R. at

118-119; see also Comm. Mem. at p. 4.

        b.     Dr. Ute Traugott

     After Plaintiff's vision problems began in May, 2001, Plaintiff began treatment with Dr.

Traugott, who continued to treat Plaintiff until December, 2003  R. at 67, 143, 272.  Dr. Traugott

prescribed the Plaintiff Betaseron in October, 2001, to help Plaintiff with her multiple sclerosis

and Dr. Traugott continued to monitor Plaintiff's visual acuity.  R. at 243-253, 271-276.  Dr.

Traugott's treatment notes chronicle Plaintiff's prescription medication history, including

Plaintiff's prescription of Zanaflex and Parmalor in March, 2002, and Plaintiff's use of prism

glasses to help ameliorate her vision problems.  R. at 245-253, 275-276.  Plaintiff complained of

"generalized soreness" in her muscles and bones during an April 4, 2003, visit with Dr. Traugott

and Dr. Traugott instructed Plaintiff to keep a diary regarding her responses to the Betaseron injections he was administering.  R. 276.[4]  As of March, 2002, Dr. Traugott found no "notable abnormalities" with Plaintiff's mental status and opined that he had no difficulty communicating with the Plaintiff.  R. at 147.  In February, 2003, Dr. Traugott noted that Plaintiff was visibly anxious, but by December, 2003, he opined that the Plaintiff's mental status appeared to have improved.  Compare R. at 278, with R. at 273; see also Comm. Mem. at p. 5.

       b.     Dr. Giovanni Angelino

Plaintiff was also treated by Dr. Giovanni Angelino for symptoms associated with multiple sclerosis between May, 2003, and September, 2004.  R. at 297-309.  In the course of treating the Plantiff, Dr. Angelino diagnosed the Plaintiff as having lumbar degenerative disc disease (abbreviated as "lumbar DDD") and lumbar radiculopathy, both of which cause muscle pain in the lower back region and legs, respectively.  R. at 299.  Plaintiff submitted complaints to Dr. Angelino about pain in these regions and occasionally complained of an accompanying decreased range of motion.  Between August, 2003, and May, 2004, Dr. Angelino administered several injections, including trigger point injections and a sacroiliac joint injection, both intended to lessen Plaintiff's pain.  R. at 300, 301, 304, 305, 306 (trigger point injections); R. at 302 (greater occipital nerve block); R. at 303 (sacroiliac joint injection); R. at 307, 308 (epidural steroid injection).  Each treatment note ends with the generalized observations that "[n]o complications [were] noted[;] [p]atient tolerated procedure well."  R. at 297-309.

_____

[4] Dr. Traugott completed two medical reviews of Plaintiff's conditions and functionality, first in April, 2002, and then again in March, 2003.  R. 143-149, 254-257.  Because the undersigned respectfully recommends that the ALJ failed to develop the administrative record with regard to the Plaintiff's psychiatric impairments, the substance of Dr. Traugott's review of Plaintiff's physical functionality will not be explored herein.

    c.  Dr. Christina Frantzeskos

  Dr. Christina Frantzeskos, Plaintiff's chiropractor, completed a medical report dated May 7, 2002, assessing Plaintiff's physical abilities and limitations.  R. at 157-164.  Dr. Frantzeskos noted that she saw the Plaintiff for "neck stiffness/muscular tightness with occasional headaches (HA)," R. at 157, and that her "treatment has been very good," R. at 158.  Although Dr. Frantzeskos noted Plaintiff had some fatigue, she attributed this condition to her poor sleep and her concern for her son, R. at 159, and she otherwise assessed the Plaintiff as being in good physical shape, including having (1) no mandatory time needed to recover from fatigue, (2) no other "objective signs of chronic fatigue," and (3) no depression incidental to fatigue.  R. at 159.  Dr. Frantzeskos opined that Plaintiff endured no physical limitations lifting or carrying items, standing or walking, or sitting, pushing, or pulling, except for her attendant difficulties performing tasks due to her double vision.  R. at 163.

    3.  Plaintiff's Other Treating Sources

    a.  The Westchester Medical Central Behavioral Health Center

  Plaintiff was evaluated by Carol Blitstein, a social worker, at the Westchester Medical Center Behavioral Health Center on July 23, 2002, following her son's receipt and ingestion of improper medication.  R. at 169; see also Pl's Mem. at p. 3; Comm. Mem. at p. 9.  Plaintiff recounted difficulties she had to Ms. Blitstein involving her multiple sclerosis symptoms, including her vision problems, and also expressed concern about her son's medical condition following his hospitalization.  R. at 170.  At the time of the evaluation, Ms. Blitstein noted that Plaintiff expressed no past or present suicidal ideation and no past or present violent ideation, and Ms. Blitstein completed Plaintiff's mental status examination with all positive observations,

noting Plaintiff's normal appearance, normal psychomotor activity, normal physical movements, good eye contact, coherent thought form, and appropriate affect, and she also noted an absence of delusions and obsessions or compulsions on the part of the Plaintiff.  R. at 178.  Ms. Blitstein further observed that Plaintiff was properly oriented to time, place, and person, that the Plaintiff exhibited normal speech, and that the Plaintiff was cooperative.  Id.  Plaintiff complained of anxiousness in connection with her son "being with [his] father."  Id.  Ms. Blitstein diagnosed Plaintiff as suffering from adjustment disorder with depressed mood, predicated in large part upon "her son's hospitalization" and her becoming more protective of him.  R. at 181.  Ms. Blitstein also noted that Plaintiff had to "cope with two very stressful situations in a relatively short period of time" – her illness and her son's hospitalization – and that she, the Plaintiff, "has not allowed herself to talk about her feelings . . . ."  R. at 182.  Plaintiff expressed an interest in attending therapy sessions, which Ms. Blitstein arranged to be conducted with Ms. Deborah Rosenberg, CSWR.

Ms. Rosenberg's progress notes from her sessions with the Plaintiff between July 31, 2002, and March 5, 2003, are contained within the administrative record.  R. at 192-235.  Ms. Rosenberg notes Plaintiff's complaints of a lack of sleep and her concern for her son early on in her progress notes, R. at 192, 193, and Ms. Rosenberg suggested that the Plaintiff join a gym for additional physical exercise, id.  Ms. Rosenberg's notes reflect that Plaintiff followed her suggestion and would go to the gym periodically.  R. at 194 ("Plaintiff reports that she has been going to the Gym . . ."); R. at 200 ("Patient reports . . . has been going to the gym on a regular basis."); R. at 201 ("Patient reporting she . . . has been trying to go to the gym when feeling particularly stressed out."); R. at 202 ("Patient talked about how she has been . . . going to the

gym on a regular basis."). Ms. Rosenberg's notes also contain references to Plaintiff's

complaints of depression and an inability to focus. R. at 193, 194, 198, 199. Ms. Rosenberg

discussed certain breathing techniques and calming practices that the Plaintiff could use to feel

less anxious and less overwhelmed, including being willing to seek help from others. R. at 207,

208, 228, 233.

Also within the administrative record are the medical progress notes supplied by Doctor

Ju Li, the treating physician Plaintiff saw while receiving therapy at the Westchester Medical

Central Behavioral Health Center. R. at 214-225; 236-238.[5] Dr. Li's initial progress notes

confirm Plaintiff's diagnosis of an adjustment disorder with depressed mood and anxiety

secondary to a general medical condition. R. at 214. Dr. Li's notes also contain the following

notation, "R/O GAD; R/O PTSD."[6]  Id.  Plaintiff's counsel suggests in his memorandum of law

that Plaintiff's diagnosis "morphed" to the "possibility of post-traumatic stress disorder," and

cites this portion of Dr. Li's notes in support of this proposition. See Pl's Mem. at p. 3 (citing R.

at 214). The undersigned, however, notes two facts that undermine counsel's limited factual

assertion. First, Dr. Li made these assessments during the early portion of her treatment of the

_____

[5] Dr. Li is a treating physician, and her opinions are entitled to "controlling weight"
provided that they are well supported by medical evidence and not inconsistent with other
medical evidence in the record. See 20 C.F.R. §§404.1513(a), 404.1527(d)(2). The opinions of
Ms. Blitstein and Ms. Rogenberg, both of whom are social workers, are not entitled to this
heightened consideration, but rather are considered along with the balance of the evidence in the
administrative record. See 20 C.F.R. §§404.1513(d), 404.1512(f) (opinions of nonexamining
sources); see also Silva v. Astrue, 07 Civ. 4530 (RJD), 2008 WL 2008 WL 4911767, at *3
(E.D.N.Y. Nov. 14, 2008) ("a social worker is not an 'acceptable medical source' to which the
rule of deference to treating sources applies.") (citing 20 C.F.R. §404.1513).

[6] From my experience and the context of the note, I believe these letters stand for "Rule
Out General Affect Disorder; Rule Out Post Traumatic Stress Disorder."

Plaintiff in September, 2002.  R. at 214 (note dated September 18, 2002).  Plaintiff's counsel's

characterization of Plaintiff's diagnosis as "later" changing to a more serious diagnosis, based

upon this notation alone, is an inference not adequately supported by this record, especially

because Plaintiff only began treatment with Dr. Li in July, 2002.  Second, Dr. Li used the

abbreviation "R/O," which is a common abbreviation for "rule out."  Thus, it appears that Dr. Li

noted in September, 2002, that a possible PTSD diagnosis – post-traumatic stress disorder – was

to be revisited and ruled out at a later point in time; Dr. Li did not affirmatively diagnose Plaintiff

with PTSD in September, 2002.

> b.    The Mental Health Association of Westchester

Plaintiff received treatment at the Westchester Medical Central Behavioral Health Center

from Dr. Li and Ms. Rosenberg until August, 2003, when "due to [Plaintiff's] inability to drive

from her home to the doctor's office (264), [] she began treating closer to her home at the Mental

Health Association of Westchester."  See Pl's Mem. at p. 3.  The only documentation from

Plaintiff's time at the Mental Health Association of Westchester within the administrative record,

however, is a single page letter from Joanne Baecher-DiSalvo, CSWR, who submitted a letter to

Plaintiff's counsel in response to the ALJ's request for followup information after he  held the

administrative hearing on March 18, 2003.  R. at 262 (Plaintiff's counsel's letter to ALJ); R. at

267 (letter from Ms. Baecher-DiSalvo, dated August 12, 2004).  Ms. Baecher-DiSalvo noted that

Plaintiff began receiving "outpatient mental health treatment" at the Mental Health Association

in August, 2003, and that the Plaintiff attended weekly sessions with Ms. Baecher-DiSalvo and

"monthly sessions with Dr. Andrea Synder."  R. at 267.  Ms. Baecher-DiSalvo explained that the

Plaintiff "is highly anxious and is diagnosed with Post Traumatic Stress Disorder," and that these

"symptoms seriously impact [Plaintiff's] functioning together with the pain and debilitating symptoms of Multiple Sclerosis." R. at 267. Absent from the record, however, are any treatment notes from Ms. Baecher-DiSalvo or notes from the referenced treating psychiatrist, Dr. Snyder.

4.      Consultative Physician's Examination

Plaintiff was consultatively examined by Dr. Syed Jalal on April 12, 2002, shortly after Plaintiff stopped working. R. at 151-154. Dr. Jalal noted Plaintiff's vision difficulties as of April, 2002, assessing Plaintiff's vision to be 20/200 in her right eye and 20/100 in her left eye. R. at 152. Dr. Jalal assessed Plaintiff's physical condition as being better than her vision, concluding that she had "no difficulty in performing tasks requiring standing, sitting, balance, and strength." R. at 154. Dr. Jalal came to this conclusion after finding a normal range of motion in Plaintiff's spine, normal muscle strength in her upper extremities, normal muscle tone, and an absence of muscle atrophy. Dr. Jalal diagnosed multiple sclerosis, offering a prognosis of "stable to poor." R. at 154.

5.      Administrative Hearing

Plaintiff appeared for an administrative hearing with counsel before the ALJ on March 18, 2003. R. at 310-335. Plaintiff continued to lodge complaints regarding her vision, noting that she has "double-vision constantly." R. at 312. Plaintiff explained her medication regimen, including her use of steroids to help correct her vision, and complained of the side effects of her medication. R. at 313-314; 318. Plaintiff noted that the side effects of her medication inhibited her ability to work, and that she experienced muscle spasms in her neck, back, and shoulders. R. at 315. Plaintiff also complained of headaches, which she stated she experienced "five times a week[,] last[ing] all day." R. at 317.

Plaintiff testified that she lived in a handicap accessible apartment with her son and relied upon the help of neighbors and friends.  R. at 319-320.  Plaintiff explained that she drove locally, including driving her son to school because she could not "put him on a bus," R. at 320, and that she drove to the store for groceries, R. at 321-322.  Plaintiff offered that she had trouble sleeping and that she would average only a few hours of sleep each night.  R. at 328.  Plaintiff attributed her difficulty sleeping to muscle and joint pain, R. at 331, and explained that she had side effects from the Betaseron injections, including soreness at the injection site and dizziness.  Plaintiff also explained that "[she] was getting panic attacks" after her son was prescribed the incorrect medication and that she had sought treatment to help lessen her anxiety.  R. at 333.

At the conclusion of the hearing, the ALJ confirmed that he was keeping the record open for a brief period of time to allow Plaintiff's counsel to supplement the record with up to date treatment notes from Dr. Traugott.  R. at 318-319 (discussion between ALJ and Plaintiff's counsel regarding Tr. Traugott's medical records); R. at 334-335.

6.      ALJ's Decision and the Commissioner's Final Decision

The ALJ issued his decision on December 21, 2004, finding Plaintiff not disabled for the period of time between March 21, 2002, and December 21, 2004.  R. at 13-20.  The ALJ followed the five step sequential evaluation process enumerated in 20 C.F.R. §404.1520 and concluded that the Plaintiff, although not able to perform her past work as a dental assistant, retained the functional capacity to perform light work, and that there existed a sufficient number of jobs in the national economy that constituted light work that the plaintiff could perform.  R. at 18-19.  At step one of the process the ALJ concluded that the Plaintiff had not performed substantial gainful employment, and at step two he determined that the Plaintiff's disabilities,

12

which he denominated as multiple sclerosis and depression, were severe for the purposes of that phase of his analysis.  R. at 14-15.  The ALJ next determined that Plaintiff's impairments did not equal one of the listed impairments in Appendix 1 of 20 C.F.R. Part 404 Subpart P, but found at step four that the Plaintiff could not resume her past previous work as a dental assistant in light of her limited vision.  R. at 18.  At five step of the analysis the ALJ relied upon "the grids," which can be found at Appendix 2 of 20 C.F.R. Part 404 Subpart P, see Bapp v. Bowen, 802 F.2d 601 (2d Cir. 1986), concluded that the Plaintiff did not suffer from any significant nonexertional limitations that would place the case outside of reliance upon the grids, and found that, using the definitive resolution offered by grids, the Plaintiff was not disabled for the time between March 21, 2002, and December 21, 2004, under the Social Security Act, see 42 U.S.C. §423(d).

  In the course of his decision, the ALJ surveyed the Plaintiff's medical history, recounted the functional capacity reports offered by her treating physicians and the consultative physician, and considered the Plaintiff's subjective complaints of pain and the side effects of the medication she experienced.  R. at 17.  The ALJ concluded that the evidence in the record supported a finding of not disabled, especially in light of her daily activities caring for herself and her son, and in light of the opinions offered by her treating physicians.  R. at 18-19.  The ALJ specifically mentioned that Plaintiff began receiving treatment for symptoms related to PTSD with the Mental Health Association of Westchester in August, 2003, but concluded that "[t]he claimant has never been psychiatrically hospitalized," and that "the claimant reported improvement in mood . . . and the latest reports show that the claimant reported no complaints of depression."  R. at 17.  The ALJ then opined that the Plaintiff "has mild limitations in activities of daily living and mild deficiencies in concentration."  R at 17-18 (emphasis in original).

Following the ALJ's decision, Plaintiff filed an appeal with the Appeals Council, R. 6-9,

which was denied on May 27, 2005, R. at 3.  The Appeals Council's denial became the

Commissioner's final decision, and Plaintiff thereafter commenced the instant action seeking

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

> 7.      Plaintiff's Arguments in Support of Motion for Judgment on the Pleadings and the
>         Commissioner's Arguments in Opposition thereto and in Support of Judgment on
>         the Pleadings

Plaintiff raises three arguments in support of reversing the Commissioner's final decision

and remanding the case to the Commissioner for further review.  First, Plaintiff argues that the

ALJ failed to the consider all of the evidence in the record tending to support the Plaintiff's

claims of disability, including her subjective complaints of pain, the side effects of her

medication, and her nonexertional impairments, including her vision and psychiatric complaints.

See Pl's Mem. at pp. 5-7.  Second, Plaintiff advances that the ALJ committed legal error when he

relied upon "the grids" at the fifth step of the sequential analysis and concluded that the Plaintiff

was not disabled.  See Pl's Mem. at p. 8.  Plaintiff contends that she suffered from significant

nonexertional limitations that are not accounted for in the grids, and that in accord with Second

Circuit case law, argues that her case should have been individually reviewed and considered by

the ALJ without relying upon the grids.  Id. (quoting Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996)).

Last, Plaintiff reiterates the statutory standard of judicial review contained within §405(g) and

suggests that the evidence in the administrative record does not support the ALJ's decision and

argues that the ALJ marshaled the evidence to conform to his predetermined decision that the

Plaintiff was not disabled.  See Pl's Mem. at p. 9.  Plaintiff urges that the Court reverse the

Commissioner's final decision, remand the case for additional administrative proceedings, and

order the ALJ to consider the extent to which the Plaintiff's nonexertional limitations impacted upon her residual functional capacity to perform light work.  See Pl's Mem. at p. 11.

The Commissioner opposes the Plaintiff's motion and asserts that the record contains substantial evidence to support the ALJ's decision that the Plaintiff retained the residual functional capacity to perform light work and that the ALJ did not overlook evidence in the record evidencing Plaintiff's nonexertional limitations.  See Comm. Mem. at pp. 13-17.  The Commissioner also maintains that the ALJ properly considered Plaintiff's subjective complaints of pain along with the other objective evidence in the record and correctly concluded that the Plaintiff's complaints of total disabling pain were not credible.  See Comm. Mem. at p. 17-19. Lastly the Commissioner argues that the ALJ's determination at step five of the sequential evaluation process was correct and that the ALJ properly relied upon "the grids" to find the Plaintiff not disabled based upon the absence of evidence supporting the existence of significant nonexertional limitations.  See Comm. Mem. at pp. 19-21.

## DISCUSSION

A.    Standard of Review

A party may move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay the trial." FED. R. CIV. P. 12(c).  When considering a Rule 12(c) motion for judgment on the pleadings, "the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party."  Madonna v. U.S., 878 F.2d 62, 65 (2d Cir. 1989).  The moving party is entitled to judgment on the pleadings "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639,

642 (2d Cir. 1988).

Section 405(g) of Title 42 of the United States Code permits a social security claimant to seek judicial review of the Commissioner of Social Security's final decision denying the claimant's application for disability benefits.   District Courts are empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g) (quoting "sentence four" of §405(g)).   It is not "the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).   Certain matters, such as resolving conflicting evidence and rendering credibility determinations, remain within the sole province of the ALJ and are not properly presented to the district court for de novo review.   See, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

A court will affirm the Commissioner's final decision if it is supported by substantial evidence and if the proper legal standards were observed by the ALJ. See Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997).   Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   A court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).   District courts, however, are under an obligation to ensure that the ALJ properly followed the procedural mechanisms promulgated by the Commissioner in the course of making his or her decision about a claimant's alleged

disability.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Wiggins v. Barnhart, 01 Civ.

4285 (GEL), 2002 WL 1941467, at *5 (S.D.N.Y. Aug. 21, 2002) ("Despite [the] apparently

deferential standard of review, administrative decisions regarding claimants' eligibility for

disability benefits have proven surprisingly vulnerable to judicial reversal.  This vulnerability

results primarily from the creation by the Commissioner . . . of a variety of procedural obligations

to which ALJs must scrupulously adhere.").  Among the legal requirements imposed upon ALJs

are the duty to develop a complete administrative record, the duty to assist claimants to obtain

their medical information in support of their claims, and the duty to weigh and consider certain

evidence offered by claimants' treating physicians.  See, e.g, Rosa v. Callahan, 168 F.3d 72, 78-

80 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Jones v. Apfel, 66 F. Supp. 2d

518, 537-38 (S.D.N.Y. 1999) (standard of review articulated in a Report and Recommendation

adopted by the District Judge).

        The Social Security Administration has promulgated a five-step inquiry that

administrative law judges must follow when assessing whether a claimant is disabled within the

meaning of the Social Security Act.  See 20 C.F.R. § 404.1520.  Step one directs the ALJ to

determine whether the claimant has engaged in substantial gainful employment.  If the claimant

has not engaged in substantial gainful employment, the ALJ's inquiry proceeds to step two,

which requires the ALJ to assess the severity of the claimant's alleged impairments or

disabilities.  If a claimant's impairments qualify as severe, the ALJ must next consider whether

the claimant has an impairment that meets one of the listings in Appendix 1 of the social security

regulations.  If the claimant has an impairment that meets one of the listings in Appendix 1, the

claimant is considered disabled within the meaning of the statute and is entitled to disability

17

insurance benefits; if the claimant does not have an impairment that meets one of the listings in Appendix 1, the ALJ must proceed to step four, where he or she assesses the claimant's functional residual capacity and determines whether the claimant can perform his or her past relevant work.  If the ALJ determines that the claimant can perform his or her past relevant work, the claimant is not disabled; if the ALJ determines that the claimant cannot perform past relevant work, the inquiry proceeds to step five.  At step five, the ALJ assesses the claimant's residual functional capacity, age, education, and work experience in order to determine if the claimant can perform other gainful employment that is available in the national community.  See 20 C.F.R. § 404.1520; Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

The burden is on the claimant to establish his or her disability, which encompasses the first four steps of the ALJ's inquiry.  See Bush v. Shalala, 94 F. 3d 40, 45 (2d Cir. 1996).  At step five, the burden shifts to the Commissioner.  Id.  An ALJ must consider the entire record, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain or disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience" when proceeding through the five step disability analysis.  See Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

B.     Plaintiff's Challenge to the Commissioner's Final Decision

       1.     Medical Evidence Pertaining to Plaintiff's Psychiatric Impairments

The majority of the Plaintiff's challenge to the ALJ's decision focuses on the ALJ's alleged failure to consider the full extent of the Plaintiff's psychiatric condition.  Plaintiff argues that Plaintiff's psychiatric problems were overlooked and inadequately explored by the ALJ, and that had these impairments been properly considered by the ALJ, such impairments would have

prevented the the ALJ from relying on "the grids" at the fifth step of the sequential analysis.  For the following reasons I conclude, and respectfully recommend that Your Honor should conclude, that the ALJ failed to develop the administrative record with regard to the Plaintiff's psychiatric impairments and that this case should therefore be remanded to the ALJ for further development of the administrative record.

Plaintiff filed her application for disability benefits on March 22, 2002, based upon her double vision and muscle spasms, both of which the record establishes are results of the Plaintiff's multiple sclerosis.  R. at 65 (Plaintiff's disability benefits application); R. at 124-126 (Dr. Kupersmith discussing Plaintiff's vision distortion as of May, 2001); R. at 297-309 (Dr. Angelino's treatment of Plaintiff's complaints of muscular pain).  Plaintiff herself noted on her application for benefits that she had "[not] been seen by a doctor/hospital/clinic . . . for emotional or mental problems that limit[ed] [her] ability to work," R. at 67, and listed each of her physicians as treating her for her vision problems and symptoms of multiple sclerosis, R. at 67-68.  The ALJ issued his decision denying the Plaintiff disability benefits on December 21, 2004. R. at 13-20.  Thus, as acknowledged by the Commissioner in his memorandum of law, the applicable time period at issue in this case is between March 21, 2002, and December 21, 2004. See Comm. Mem. at p. 2.

Plaintiff's denomination of her disabilities as double vision and muscle spasms does not limit her claim for an entitlement to disability benefits to only those grounds.  The Social Security regulations establish that a claimant's application for disability benefits "will remain in effect from the date it is filed until [the Commissioner] make[s] a final determination on your application, unless there is a hearing decision on your application.  If there is a hearing decision,

your application will remain in effect until the hearing decision is issued." See 20 C.F.R. §416.330; see also Wiggins, 2002 WL 1941467, at *8 n. 6.  Moreover, the Second Circuit has held that "[a]n application for disability benefits remains in effect until final decision by the Secretary and a claimant will prevail if he [or she] can show that he [or she] became disabled at any time up to the date of decision." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978); see also Spicer v. Califano, 461 F. Supp. 40, 47 n.5 (N.D.N.Y. 1978).  Thus, under §416.330 and the Second Circuit's Bastien decision, a claimant's application for disability benefits remains open and pending with the Commissioner until the ALJ issues his or her decision, and the ALJ must consider a claimant's assertion of disabilities arising during that entire time period.  See Batsien, 572 F.2d at 912 (discussing a paucity of evidence in the record regarding the Plaintiff's disabling conditions while his application for benefits was pending).

    Application of this principle has the potential of imposing a significant burden on an ALJ when he or she is not informed of all of the grounds upon which a claimant claims he or she is disabled.  For this reason, the Commissioner has promulgated certain rules requiring claimants to identify and establish their disabilities during the administrative process.  See 20 C.F.R. §404.1512(a) ("In general, you [the claimant] have to prove to us that you are . . . disabled. [Y]ou must bring to our attention everything that shows you are . . . disabled.").  Importantly, the Commissioner has specified that "only impairments you [the claimant] say you have or about which we [the Social Security Administration] *receive evidence*," will be considered.  Id. (emphasis added).  The Second Circuit's observation that a claimant has the "burden of proof" of establishing his or her disability at the first four steps of the sequential analysis conducted by the ALJ incorporates this common sense principle that the grounds a claimant wishes to rely upon in

support of his or her disability application must be presented to the ALJ.  See Perez, 77 F.3d at
46 (explaining the claimant's burden at steps one through four and the Commissioner's burden at
step five).  This principle, however, does not negate an ALJ's independent duty to develop the
administrative record, even when the claimant is represented by counsel during the
administrative process.  See Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996).

     This case falls into the Commissioner's latter statement contained with 20 C.F.R.
§404.1512(a) that evidence of a disability, which is received during the pendency of a claimant's
application for benefits, must be considered by the Commissioner in the course of assessning
whether he or she is disabled within the meaning of the Social Security Act.  Although the instant
Plaintiff's application for disability benefits was initially premised upon her physical
impairments, R. at 65, the grounds for Plaintiff's disability benefits expanded during the
pendency of her application to include claims of psychiatric impairments, R. at 240-41
(Plaintiff's counsel's pre-hearing memorandum submitted to the ALJ dated March 14, 2003,
noting that the Plaintiff is "under treatment for anxiety and depression.").  Importantly, the ALJ
was informed of this additional basis of disability by Plaintiff's attorney, id., and the ALJ
acknowledged this additional basis of disability in his decision, commenting at the outset that
Plaintiff "alleges that she became disabled on March 21, 2002[,] due to multiple sclerosis and
depression," R. at 13.  The ALJ additionally reviewed and included information from the
Westchester Medical Center Behavioral Health Center submitted by Ms. Blitstein, Ms.
Rosenberg, and Dr. Li, and from the Mental Health Association of Westchester submitted by Ms.
Baecher-DiSalvo in his decision finding the Plaintiff not disabled.  R. at 16-17.  The ALJ
ultimately concluded that the Plaintiff "has mild limitations in activities of daily living and mild

21

deficiencies of concentration." R. at 17-18 (emphasis in original).  The ALJ further concluded

that these mild limitations and deficiencies did not seriously impact upon Plaintiff's ability to

perform light work and relied upon the "the grids" at step five of the sequential analysis to find

that the Plaintiff was not disabled.  R. at 17-20.

I conclude, however, and respectfully recommend that Your Honor should conclude, that

the ALJ committed several legal errors in the course of making these determinations.  First, I

respectfully recommend that ALJ failed to develop the record as it pertains to the Plaintiff's

psychiatric condition.  Although the ALJ acknowledged the existence of some evidence

pertaining to Plaintiff's psychiatric limitations in his decision, see R. at 17 ("It was noted that the

claimant was under outpatient treatment since August 2003, for post-traumatic stress disorder

with medications and therapy), the ALJ appears to have undertaken no effort to explore this

assertion or obtain information about this condition.  The only evidence in the record regarding

this specific assertion about Plaintiff's August, 2003, treatment is the one page letter from Ms.

Baecher-DiSalvo that Plaintiff's counsel submitted to the ALJ pursuant to the ALJ's request for

followup information, R. 262-63.  This letter included a reference to an additional treating

physician, Dr. Andrea Snyder, who allegedly began treating the Plaintiff for symptoms relating to

post-traumatic stress disorder in August, 2003.  R. at 267.   The administrative record, however,

contains no information from Dr. Snyder and no further information from Ms. Baecher-DiSalvo.

The absence of such additional information is particularly confusing given the ALJ's assessment

in his decision that "[t]reatment notes also show that the claimant reported improvement in mood

and sleeping with regular exercise *and the latest reports show that the claimant reported no*

*complaints of depression*." R. at 17 (emphasis added).  Respectfully, the ALJ's conclusion that

"the claimant is leading a very active existence," R. at 17, is not supported by substantial

evidence in the presence of other evidence submitted to him suggesting that the Plaintiff began

receiving treatment for post-traumatic stress disorder in August, 2003, while her application for

disability benefits was pending before the ALJ.  R. at 267.  Thus, it appears that the ALJ was

presented with information from a treating source – who in turn informed the ALJ of the

existence of an additional treating physician – which was relevant to the time period and the

claims at issue in this case, but which the ALJ overlooked or ignored.

   "It is the rule in our circuit that the ALJ, unlike a judge in trial, must . . . affirmatively

develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even

if the claimant is represented by counsel."  Tejada, 167 F.3d at 774 (quoting Pratts, 94 F.3d at

37).  Part of an ALJ's responsibility is to ensure that a claimant's complete medical history is

accounted for, especially the observations and opinions of a claimant's treating physicians.  See,

e.g., Rosa, 168 F.3d at 79-80; Shipman v. Astrue, 02 Civ. 6987 (KMK)(RLE), 2008 WL 216615,

at *4-5 (S.D.N.Y. Jan. 23, 2008); 20 C.F.R. §404.1527(d).  The ALJ's duty to develop the record

is not mitigated when such additional information arises during the pendency of a claimant's

application for disability benefits.  See Bastien, 572 F.2d at 911-12.

   In this case, however, the ALJ was presented with such additional information but

appears to have initiated no effort to develop the record with regard to such information prior to

issuing his decision.  Moreover, the ALJ expressly relied upon older documentation in support of

his conclusions that the Plaintiff's psychiatric condition was "mild" between March 21, 2002,

and December 21, 2004, and that the Plaintiff suffered from no significant nonexertional

limitations.  R. at 17-18 (referencing the Westchester Medical Center Behavior Health Center's

intake evaluation of the Plaintiff dated July 23, 2002).  In light of the ALJ's affirmative duty to develop a claimant's complete medical history impartially, the ALJ cannot choose to acknowledge certain information in the record and disregard other information presented to him that is relevant to the time period in question and germane to one of the Plaintiff's alleged disabilities.  See Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his [or her] determination, without affording consideration to the evidence supporting the plaintiff's claims.  It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim.") (citing Lopez v. Sec'y of Dept. of Health and Human Serv., 728 F.2d 148, 150-51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him [or her].")); see also Wiggins, 2002 WL 1941467, at *5 ("an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the absence of probative evidence supporting the opinions of a claimant's expert without making an affirmative effort to fill any gaps in the record before him [or her].") (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

      The import of these principles should not be read as lessening a claimant's responsibility to present information about his or her disability to the Commissioner in a timely and seasonable manner.  It is unclear to the undersigned why Plaintiff's counsel choose not to explore his client's statement that she was seeing an additional psychiatrist for treatment for post-traumatic stress disorder while awaiting the ALJ's decision, and it is further unclear why Plaintiff's counsel choose not to present such additional information to the Appeals Council when he challenged the ALJ's decision, see Perez, 77 F.3d at 45 (citing 20 C.F.R. §404.970(b), allowing claimants to

submit new evidence to the Appeals Council).  These omissions, however, do not neutralize the

ALJ's independent, affirmative duty to perfect a complete medical record in the course of

rendering a decision on a claimant's application for disability benefits, even when the Plaintiff

has retained counsel.  See Pratts, 94 F.3d at 37.

       The facts of this case illustrate both that the ALJ was aware of the Plaintiff's assertion

that she suffered from certain nonexertional, psychiatric impairments and that he considered and

rejected such claims in the course of reviewing her request for disability benefits.  Plaintiff

testified at her administrative hearing that she suffered from panic attacks, R. at 333-334, and

Plaintiff presented information to the ALJ prior to her administrative hearing from the

Westchester Medical Center Behavioral Health Center about her depression and complaints of

anxiety, R. at 192-235.  Additionally, information concerning the Plaintiff's mental health

treatment relevant to the time period in question was presented to the ALJ from an additional

treating source prior to the ALJ rendering his decision.  R. at 17-19, 267.  In light of the absence

of information from either the additional treating source, Ms. Baecher-DiSalvo, or from the

additional treating physician, Dr. Snyder, and considering that the ALJ is charged with obtaining

and considering such information, the undersigned cannot conclude that the ALJ honored his

duty to develop the administrative record fully while the Plaintiff's application was open and

pending before the Commissioner.

       Accordingly, I conclude, and respectfully recommend that Your Honor should conclude,

that there exist substantial gaps in the administrative record pertaining to the degree and severity

of Plaintiff's psychiatric condition between March 21, 2002, and December 21, 2004, that

preclude this Court from finding that the Commissioner's final decision that the Plaintiff is not

disabled is supported by substantial evidence.  The potential significance of Plaintiff's

nonexertional limitations should be explored by the ALJ upon remand, especially in light of the

ALJ's previous conclusion that the Plaintiff did not suffer from significant nonexertional

limitations and his reliance upon "the grids" at step five of the sequential evaluation process.  I

respectfully recommend that the case should be remanded to the Commissioner to develop the

record as to extent of Plaintiff's psychiatric limitations, and that the ALJ should make efforts to

obtain and review the medical records and opinions of Plaintiff's additional treating physician,

Dr. Andrea Snyder, and the records from Plaintiff's other treating sources, including the notes

from her social worker at the Mental Health Association of Westchester, Ms. Baecher-DiSalvo.

Because such evidence is not in the administrative record at this time, I respectfully recommend

that remanding this case for further development of the record is the most appropriate remedy.[7]

See Rosa, 168 F.3d at 82-83 ("Where there are gaps in the administrative record or the ALJ has

applied an improper legal standard, we have, on numerous occasions, remanded to the

Commissioner for further development of the evidence.") (internal citations and quotations

omitted).

## CONCLUSION

For the aforementioned reasons I conclude and respectfully recommend that Your Honor

---

[7] Although a considerable period of time has passed since Ms. Baecher-DiSalvo authored her August 12, 2004, letter, raising the prospect that Plaintiff may have an additional treating physician with information relevant to her disability claims, as noted by Plaintiff's counsel, Plaintiff re-applied for disability benefits and was awarded benefits as of December 22, 2004, in March, 2005.  See Pl's Mem. at p. 11.  Given the Commissioner's regulation that information about a claimant is collected for the twelve month period preceding the filing of a claim for benefits, see 20 C.F.R. §404.1512(d)(1)-(2), it is likely that this information is readily available and that the ALJ will not encounter substantial delay in developing the record through December 21, 2004.

should conclude that the ALJ committed legal error by failing to develop the administrative record with regard to the Plaintiff's asserted psychiatric limitations and that Plaintiff's motion for judgment on the pleadings seeking a remand to the Commissioner of Social Security for further development of the administrative record for the time between March 21, 2002, and December 21, 2004, docket number 5, should be granted.  I respectfully recommend that this remand should be entered pursuant to sentence four of 42 U.S.C. §405(g) and that the Clerk of the Court should be directed to mark this case closed.  I accordingly respectfully recommend that the Commissioner's cross motion for judgment on the pleadings seeking confirmation of his final decision denying the Plaintiff disability benefits, docket number 8, should be denied.

## **NOTICE**

_____Pursuant to 28 U.S.C. §636(b)(1), as amended, and FED. R. CIV. P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to FED. R. CIV. P. 6(d), or a total of thirteen (13) working days, see FED. R. CIV. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: April 9, 2009
       White Plains, New York

                          Respectfully Submitted,


                          Lisa Margaret Smith
                          United States Magistrate Judge
                          Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

       The Honorable Kenneth M. Karas, U.S.D.J.

       Counsel of Record for Plaintiff and Commissioner of Social Security

28